satisfactory and as good, but not as most cooperative; is that correct?

A I'm not speaking about cooperation, I'm speaking about his creating problems, and from time to time those were serious problems, with the captain, the chief mate and/or -- notwithstanding but not limited to but including the lower crews.

Q You're not talking about cooperative, but I am.

You have described the relationship as satisfactory and as good, and you have told us about these supposed incidents, but would you describe the relationship as one of a nature of most cooperative?

MR. FERNANDEZ: Objection.

A The criteria of cooperative --

THE WITNESS: No --

A Cooperative means cooperative.

MR. VEKRIS: He's saying what it means in Greek.

A Spiliotes was cooperative with the office to the extent that whatever were asked of him were -- were being asked of him, whatever job

Exhibit B

objections aimed at affecting the testimony of the witness, and I object to the constant interruptions. It's unprofessional and ineffective, as a matter of fact.

MR. FERNANDEZ: Go ahead, Captain, answer the question.

BY MS. VAN HEMMEN:

Q Go ahead, Capt. Vezyrtzis. Do you know if this invoice was paid?

A Well, I will tell you that for these services on the MINERVA ZEN voyage II at IMTT terminal, Worldwide Marine Services was as per agreement paid $1,772.70.

Q Are you now referring to TKR 1419?

A MIN 275. He has given these services for the ROB according to our agreement free of charge, as per his documents. And according to our agreement he was going to issue this -- this additional invoice for our own reasons, for Minerva Marine's own reasons, and he is not entitled to this amount of $688.90 as per invoice -- invoice 1419A/2000.

MS. VAN HEMMEN: Let the record

reflect that Capt. Vezyrtzis was referring to a document previously marked as Exhibit E.

MR. VEKRIS: The last page of it.

MS. VAN HEMMEN: The last page of it.

Q Correct?

A Yes.

Q If I understand you correctly, it's your position that the agreement you had with Capt. Spiliotes --

A Yes.

Q -- was that the fees paid in connection with invoice 1419/2000 --

A Let me check. Can you say please the number again?

Q 1419/2000, the fees paid $1,772.70, in fact, compensated him for the ROB survey he performed?

A Yes.

Q That's your position?

A Yes.

Q And that was the agreement you had with Capt. Spiliotes, that the flat rate attendance fee would include the cost of an ROB

survey; is that right?

A Yes.

Q Captain Spiliotes also sent you a separate invoice for the ROB survey; correct?

A On our request and agreement.

Q And you requested that he send you this separate ROB survey invoice; that's right?

A Yes, this was our agreement. He agreed to -- we asked him and he said yes, we will do it.

Q Captain Spiliotes, you're saying, understood that he was to send you a second ROB survey invoice, and it was --

A Not a second ROB, one invoice for ROB survey.

Q Captain Spiliotes understood that in addition to the flat rate attendance invoice he would send you a second invoice for each attendance on board the ship; is that right?

MR. FERNANDEZ: Objection.

A He was to send one -- as I explained to you before, this -- for this specific call, if we -- if he invoiced as per our agreement, he should have issued the TKR 1419/2000 with the

here.

THE VIDEOGRAPHER: Sorry, this is the end of tape number 6. It's 2:49.

(Pause.)

It's 2:50, and it's the beginning of tape number 7.

Q Captain, you testified concerning the circumstances under which Minerva sometimes used charterer's agents to perform the same type of function that owner's protective agents are appointed for; is that right?

A We were using charterer's agents charterers nominated for owners to appoint in the charter party. This is the usual stipulation in connection with agency. So when we go anyplace for load or discharge, the charterers will nominate an agent and the owners will appoint to perform either full agency -- to perform either full agency, meaning that the charterer's agent will attend to all matters, including the owners, or not. If it is not full agency, the charterer's agent will insure to clear the vessel in and out, will make all the job in connection with the cargo, and the owners' matters will be

looked after by another agency, which is called protective.

Q And sometimes you would make the decision based on the financial reality to just use the charterer's agent for the issues that the owner had; is that right?

A Yes. Yes.

Q And sometimes you found that relationship unsatisfactory to Minerva; isn't that right?

MR. FERNANDEZ: Objection.

A What do you mean -- situation, what you mean?

Q I think you testified that when it came to delivering cash to the ship the charterer's agents would insist on some percentage of that cash to deliver; is that right?

A Right. Commission.

Q And then they would also charge you for armed guards to deliver it?

A Yes.

Q And they would charge you an individual fee for every little service they

performed for you; isn't that right?

MR. FERNANDEZ: Objection.

A Yes.

Q And you found that unsatisfactory on some occasions?

A Yes.

Q And so instead you would appoint Worldwide Marine; is that right?

MR. FERNANDEZ: Objection.

A We would appoint -- we will appoint a protecting agent.

Q And Worldwide Marine is a protective agent, is your position; correct?

A Yes.

Q And you were talking about these fees that the charterer's agents sometimes charged you and you talked about their tariff; is that right?

A Yes, there are some tariffs.

Q And what's your understanding of a tariff?

A A tariff is a tariff.

Q What is a tariff?

A It writes the cost for -- the service that they are providing.

N. Vezyrtzis

Q Now I'd like you to take a look at the document that we've marked as Exhibit E, please.

A Yes.

Q And take a look at page 2.

A Yes.

Q And on page 2, what does it read at the very top of the left-hand column.

A Schedule of agency fee, charges for vessels calling United States ports.

Q And there are 15 items; is that right?

A Yes.

Q And in each of those items Worldwide Marine lists the fee for performing the specific duties described in those items?

A Well, some of these, yes; some of these not. Anyway, he gives an idea of what we're going to pay.

Q Okay. Well, the document speaks for itself, but he does on page 2 list the fees for various services; isn't that right?

A Yes.

Okay.

N. Vezyrtzis

Q These fees listed on page 2 for the various services did not apply when Thenamaris and Minerva used Capt. Spiliotes' services; isn't that right?

MR. FERNANDEZ: Objection.

A Yes, we had a special agreement.

Q You had a special agreement, that's right, and your special agreement is in part reflected on the final page of E; isn't that right?

MR. FERNANDEZ: Objection as to "in part."

A Yes.

Q And you indicated that the charterer's agents sometimes if you used their services one day and then you wanted to use their services the next time the ship called, they would say no, we're not going to perform services for you unless you pay us first for the last time; isn't that right?

MR. FERNANDEZ: Objection.

A There were some balances, yes.

Q But, Captain, Worldwide Marine didn't do that; isn't that right?