NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MINERVA MARINE, INC., | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 02-2517 (WHW) |
| | : | |
| JAMES SPILIOTES, individually, and | : | |
| WORLDWIDE MARINE SERVICES, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |
| JAMES SPILIOTES, individually, and | : | |
| WORLDWIDE MARINE SERVICES, INC. | : | |
| | : | |
| Third-Party Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| ANDREAS MARTINOS, individually, | : | |
| | : | |
| Third-Party Defendant. | : | |
| | : | |

**Walls, District Judge**

Plaintiff Minerva Marine, Inc. ("Plaintiff" or "Minerva") moves for partial summary judgment on Defendants/Third-Party Plaintiffs James Spiliotes ("Spiliotes") and Worldwide Marine Services, Inc.'s ("WWM") (together, "Defendants/Third-Party Plaintiffs") counterclaims for: violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq., (first counterclaim); defamation (third counterclaim); tortious interference (fourth counterclaim); malicious use of process (fifth counterclaim); intentional infliction of

-1-

NOT FOR PUBLICATION

emotional distress (sixth counterclaim); and negligent infliction of emotional distress (seventh counterclaim). Plaintiff and Defendants/Third-Party Plaintiffs have also filed several motions to strike in connection with the Plaintiff's motion for partial summary judgment. The motions are decided without oral argument pursuant to Fed.R.Civ.P. 78.

## FACTS AND PROCEDURAL BACKGROUND

Some of the factual background in this matter has been set forth in this Court's April 5, 2005 Opinion, which granted in part and denied in part the Defendants/Third-Party Plaintiffs' motion for summary judgment on the Plaintiff's first claim for defamation, and granted the Defendants/Third-Party Plaintiffs' motion for summary judgment on the Plaintiff's second claim for injurious falsehood. Minerva Marine, Inc. v. Spiliotes, et al, No. 02-2517, slip op. at 1 (D.N.J. April 4, 2005). For purposes of this motion, the Court will again present the circumstances of the case, incorporating those facts particularly relevant to the Plaintiff's present motion.

Minerva is a Liberian corporation, operating with an office and place of business in Voula, Greece. Minerva is in the business of managing ships that transport materials and cargo to various ports. Andreas Martinos ("Martinos") is the managing director of Minerva. Before he formed Minerva, Martinos operated, along with his family, Thenamaris Ship Management, Inc. ("Thenamaris"), a Greek ship operating company.

Captain James Spiliotes, a resident of Cliffside Park, New Jersey, is an officer and director of WWM, a New Jersey corporation with an office and place of business also located in Cliffside Park, New Jersey. WWM is a company formed by Spiliotes in 1985 for the purpose of

**NOT FOR PUBLICATION**

providing surveying and other services to the marine industry. The corporation allows Spiliotes to offer his maritime skills in a shoreside capacity.

From 1998 to 2001, WWM was frequently retained by Minerva to protect Minerva's vessels and owner's interests while Minerva's vessels were in port. WWM was primarily hired to attend to Minerva's ships while docked in ports in the northeastern United States. The precise nature of the employment relationship between Spiliotes, WWM and Minerva, however, is one of the primary facts in dispute in this case, particularly with respect to the CEPA counterclaim (first counterclaim). Spiliotes contends that he was a "port captain" or employee of Minerva, while Minerva contends that he was a "vessel agent" or independent contractor.

This action arises from events that took place on September 26, 2001, on board the Plaintiff's vessel, the M/T Minerva Julie ("the "Minerva Julie"). On that day, just a few weeks after the September 11 terrorist attacks on the World Trade Center, the Minerva Julie was docked at the IMTT terminal in Bayonne, New Jersey. Spiliotes, acting in the scope of his employment and on behalf of WWM, was a vessel agent for the Plaintiff while the Minerva Julie was docked in Bayonne.[1] The vessel was discharging its cargo of unleaded gasoline. While Spiliotes was onboard the vessel, he asked Chief Officer Kyriakos Tsingis when the discharge would be completed. The parties dispute the substance of Tsingis's answer. Plaintiff contends that Tsingis said that the discharge would be completed between 1955 and 2000 hours and that he could not increase the pressure on the lines because some of the cargo might leak causing an explosion or

---

[1] For purposes of this factual background, the Court has described Spiliotes as a "vessel agent" for Minerva, but this label bears no influence on this Court's determination of the actual relationship between Spiliotes and Minerva.

NOT FOR PUBLICATION

fire. Spiliotes claims that Tsingis said that the discharge would be completed in 2000 hours unless he puts a bomb on the ship and blows it up.

After Tsingis answered Spiliotes, there is some dispute over what happened next between Spiliotes and the Master of the vessel, Vasilios Kazepis. There is no dispute that after this, Spiliotes left the vessel and informed IMTT Port Security that Tsingis had threatened to blow up the ship. Port Security, in turn, informed the Federal Bureau of Investigations, the United States Coast Guard, and the Bayonne Police Department. Tsingis was arrested by the Bayonne Police, released later that night, and departed with the vessel. After Tsingis was arrested but before he returned to the vessel, the Master of the vessel fired Spiliotes.

Minerva filed suit in the District of New Jersey against Spiliotes and WWM, alleging claims of defamation and injurious falsehood. The basis for these claims was a statement made by Spiliotes to IMTT Port Security, that Tsingis had threatened to blow up the vessel with a bomb, and six additional statements contained in a letter from Spiliotes to the Coast Guard, suggesting that Minerva was employing "individuals with terrorist affiliations or who are terrorist sympathizers," and that Minerva should be punished for employing such people. Minerva Marine, Inc. v. Spiliotes, et al, No. 02-2517, slip op. at 3 (D.N.J. April 4, 2005). On August 2, 2002, Defendants/Third-Party Plaintiffs filed their answer to the complaint, including counterclaims against Minerva and a third-party complaint against Martinos.

After Minerva filed its complaint against Spiliotes and WWM, Spiliotes and/or their agents proceeded to forward copies of the complaint to the *International Shipping Gazette TradeWinds* ("*TradeWinds*"). On August 16, 2002, *TradeWinds* published an article titled "US

-4-

NOT FOR PUBLICATION

agent sues Martinos over bomb threat." The article states that Martinos was being sued by Spiliotes for $110 million, after Spiliotes had been fired for reporting a Minerva crew member's alleged anti-American threats. According to the article, Minerva said that Spiliotes's "account of what happened was fabricated." The article also states that, according to Minerva, Spiliotes came on board the Minerva Julie and started verbally abusing Tsingis and insisted that he speed up the discharge process. The article adds that when Tsingis refused to speed up the discharge process, Spiliotes maliciously filed a false report to terminal security. On October 18, 2002, *TradeWinds* published a second article titled "Minerva denies it is a Martinos company." The article stated, *inter alia*, that Spiliotes lied about the Chief Mate's comments.

Spiliotes alleges that Minerva and/or Martinos have engaged in conduct that has caused him harm. Primarily, Spiliotes alleges that Minerva retaliated against him by firing him for reporting threatening statements to IMTT Port Security. Additionally, Spiliotes alleges that Minerva has contacted other ship owners and instructed them not to hire him; threatened him with legal action to prevent him from cooperating in the criminal case against Tsingis; filed a baseless lawsuit against him; and defamed him in *TradeWinds*. According to Spiliotes, Minerva's conduct has had a severe negative effect on his emotional state and life, causing him to suffer from anxiety and depression, for which he has had to seek psychological treatment. These allegations are disputed by Minerva.

Spiliotes claims that since 2001, his work as a vessel's agent has significantly declined. Before September of 2001, he received seven jobs from UK P&I Club, but has only received one job since. He adds that he received one or two jobs a year from Ranger Marine before 2001, but

NOT FOR PUBLICATION

has only received one job from them since September of 2001.

On August 7, 2003, Spiliotes and WWM filed a second amended answer with counterclaims against Minerva, and a third-party claim against Martinos.[2] The counterclaims against Minerva were for violation of the New Jersey Conscientious Employee Protection Act (first counterclaim); defamation (second counterclaim); defamation (third counterclaim); interference with perspective economic advantage (fourth counterclaim); malicious use of process (fifth counterclaim); intentional infliction of emotional distress (sixth counterclaim); negligent infliction of emotional distress (seventh counterclaim); breach of contract (eighth counterclaim); unjust enrichment (ninth counterclaim); quantum meruit (tenth counterclaim); and an alter ego claim against Martinos (eleventh counterclaim).[3]  Plaintiff now moves for partial summary judgment on the first, third, fourth, fifth, sixth and seventh counterclaims, on the grounds that there are no genuine issues of material fact.  Both parties have submitted motions to strike testimony in connection with the motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby,

---

[2]A first amended answer with counterclaims and a third-party claim was filed on July 22, 2003.

[3]The second counterclaim was withdrawn with prejudice by the Defendants/Third-Party Plaintiffs on June 18, 2004.

**NOT FOR PUBLICATION**

Inc., 477 U.S. 242, 248 (1986). A factual dispute is material if, under the substantive law, it would affect the outcome of the suit. Id. at 248.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id.

Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party must prove beyond a "mere scintilla" of evidence that a genuine issue of material fact exists. Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1363 (3d Cir.1992). Moreover, "a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. Am. Tel. & Tel., 161 F.Supp.2d 323, 327 (D.N.J.2001) (citing Celotex Corp., 477 U.S. at 322-23). Nor may a party simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (citing Anderson, 477 U.S. at 249).

Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which

-7-

NOT FOR PUBLICATION

that party will bear the burden of proof at trial." Serbin v. Bora Corp., 96 F.3d 66, 69 n. 2 (quoting Celotex, 477 U.S. at 322). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative,' the court must enter summary judgment in favor of the moving party." Heffron v. Adamar of New Jersey, Inc., 270 F. Supp. 2d 562, 569 (D.N.J. 2003) (citing Anderson, 477 U.S. at 249-50.).

The evidence need not be in a form that would be admissible at trial. Celotex, 477 U.S. at 324. But Fed.R.Civ.P. 56(e) provides that affidavits opposing summary judgment motions must "be made on personal knowledge," and hearsay within such affidavits or testimony may be considered, but only where the hearsay declarant can be produced at trial to offer his or her statements in admissible form. E.g., Rossi v. Standard Roofing, Inc., 156 F.3d 452, 470 n. 13 (3d Cir. 1998); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1235 n. 9 (3d Cir. 1993).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Id. at 247-48. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

## DISCUSSION

Before turning to the Plaintiff's motion for partial summary judgment, this Court must

NOT FOR PUBLICATION

address the various motions to strike that have been filed by both parties.

I.      **Motions to Strike**

Defendants/Third-Party Plaintiffs have moved to strike the depositions of Elias Katsaros

and Andreas Spiridonakos, and the affidavit of Michael Fernandez concerning the Declaration of

James Baker (the "Baker Declaration") from the Plaintiff's papers in support of its motion for

summary judgment.  Plaintiff has moved to strike the Baker Declaration and various sections of

the  "Declaration of James Spiliotes in Opposition to Plaintiff's Motion for Partial Summary

Judgment" (the "Spiliotes Declaration").

>       **A.      Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of**
>               **Elias Katsaros**

Defendants/Third-Party Plaintiffs move to strike the deposition testimony of Captain

Elias Katsaros ("Katsaros"), submitted by the Plaintiff in support of its motion for summary

judgment, on the grounds that Katsaros was never designated an expert witness under Rules 702,

703 and 705 of the Federal Rules of Evidence.  According to Defendants/Third-Party Plaintiffs,

the Plaintiff did not file an expert report for Katsaros by the November 3, 2003 deadline for

submission of expert reports, as set by Magistrate Judge Wigenton.

Defendants/Third-Party Plaintiffs argue that Katsaros is clearly being used as an expert

witness within the meaning of Fed.R.Evid. 702, not as a lay witness.  Specifically, they argue that

Katsaros never had any knowledge of the relationship between Spiliotes and Minerva, nor did he

possess knowledge of the events onboard the Minerva Julie during the September 24 through 26,

2001 time period.  Rather, they argue that Katsaros is being used to provide expert testimony on

the general role of a protective agent for a vessel owner.  They note that his testimony covers the

**NOT FOR PUBLICATION**

following: Katsaros's qualifications and work history; the formation of his company, Maritime Endeavors; the definition of a protective agent; the services provided by such agents; the services provided by Maritime Endeavors as protective agent; the forms and lists Maritime Endeavors provides to owners; what is meant by the phrase "smooth and quick turn around" of the vessel; when Marine Endeavors stays onboard vessels; and special discounts Maritime Endeavors provides owners. (Plaintiff's Supplemental Local Rule 56.1 Statement of Undisputed Material Facts ("Supplemental SUMF") at ¶¶ 170-84).

Plaintiff, on the other hand, argues that Katsaros's deposition testimony is that of a lay witness. According to Plaintiff, one of the issues in this case is the role that Spiliotes performed for Minerva. Plaintiff contends that Spiliotes was a typical vessel agent, while Defendant/Third-Party Plaintiff argues that Spiliotes was a port captain. Plaintiff intends to use the deposition testimony of Katsaros, based on his own personal knowledge and experience, to show that the services Spiliotes provided to Minerva were merely those of a vessel agent, not of a port captain. Plaintiff notes that Katsaros has not been provided any facts, data or anything else upon which to render an opinion, and readily acknowledges that Katsaros had no knowledge of the events that took place on board the Minerva Julie in September of 2001. Rather, Katsaros is testifying as to his own personal knowledge concerning the role of a vessel agent.

Plaintiff argues that Katsaros's testimony is critical because it establishes that all of the functions provided by WWM to Minerva (which Spiliotes relies upon in arguing that he was a port captain or otherwise an integral part of Minerva) are commonplace for an owner's protective agent. In other words, Plaintiff wants to use Katsaros's testimony to show that there is nothing

-10-

**NOT FOR PUBLICATION**

special and integral about the services WWM provided to Minerva that would have given rise to

an employment relationship.

Having reviewed the testimony of Katsaros, this Court concludes that Katsaros is being

used to testify as an expert in contravention of the requirements of Fed.R.Evid. 701. Rule 701 of

the Federal Rules of Evidence contains the requirements for lay witness opinion testimony, and

provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of
> opinions or inferences is limited to those opinions or inferences which are (a)
> rationally based on the perception of the witness, and (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact in issue,
> and (c) not based on scientific, technical, or other specialized knowledge within
> the scope of Rule 702.

Fed.R.Evid. 701. The rule was amended in 2000 to include subsection (c), which states that lay

opinions may "not [be] based on scientific, technical or other specialized knowledge within the

scope of Rule 702." Fed.R.Evid. 701. The question here is whether Katsaros's testimony falls

under Fed.R.Civ.P. 701(c)'s definition of "specialized knowledge," which would require this

court to exclude his testimony on the grounds that it is expert testimony.

Since 2000, relatively few cases have construed the scope of subsection (c). One of the

cases addressing this matter that has been cited by the Plaintiff is <u>Tampa Bay Shipbuilding &</u>

<u>Repair Co. v. Cedar Shipping Co., Ltd.</u>, 320 F.3d 1213 (11th Cir. 2003). That case involved a

contract dispute over the amount due to a ship repair company for repairs that it made to a ship.

At issue was whether the District Court properly permitted ship repairer's employees to testify as

lay witnesses. The employees testified that the charges were fair and reasonable and in line with

similar services provided by similar operations. Following an extensive review of the 2000

-11-

NOT FOR PUBLICATION

amendment to Fed.R.Evid. 701 and the accompanying advisory committee notes, the Circuit

concluded that the testimony was permissible, as it was of a type traditionally and properly

considered lay witness testimony, and was not based on specialized knowledge subject to

Fed.R.Evid. 702. 320 F.3d at 1223.

In permitting the evidence, the Circuit placed particular emphasis on the advisory

committee's note to Rule 701, concerning testimony of business owners and officers. The

relevant portion of the Committee notes reads:

> most courts have permitted the owner or officer of a business to testify to the
> value or projected profits of the business, without the necessity of qualifying the
> witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube,
> Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in
> permitting the plaintiffs owner to give lay opinion testimony as to damages, as it
> was based on his knowledge and participation in the day-to-day affairs of the
> business). Such opinion testimony is admitted not *because of experience, training
> or specialized knowledge within the realm of an expert, but because of the
> particularized knowledge that the witness has by virtue of his or her position in
> the business. The amendment does not purport to change this analysis.*

Fed.R.Evid. 701 advisory committee's note (emphasis added). The Circuit read this comment to

mean that opinion testimony by business owners and officers is one of the prototypical areas

intended to remain undisturbed.

There is an important distinction to be drawn between Tampa Bay and this case, however.

In Tampa Bay, the issue was whether the Court could permit the testimony of witnesses who

were all involved in the process of determining the final invoice price for the ship repairs. After

offering their testimony as to how the charges were determined, each witness was asked whether

the charges were fair and reasonable in the context of the ship industry. Tampa Bay, 320 F.3d at

1217-21. The Circuit found this testimony permissible because the testimony was of a type

-12-

**NOT FOR PUBLICATION**

traditionally considered permissible lay witness testimony, not based on specialized knowledge

subject to Rule 702. Unlike the employees in <u>Tampa Bay</u>, Katsaros has not perceived firsthand

any of the events that are involved in this case. As a result, Katsaros is merely offering

specialized knowledge that is within the scope of expert testimony. Because Katsaros has not

been properly admitted as an expert witness, the motion to strike his testimony is granted.

**B.     Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos**

Defendants/Third-Party Plaintiffs have also moved to strike the deposition of Andreas

Spiridonakos ("Spiridonakos") on the grounds that Plaintiff has failed to submit an expert

disclosure report for this witness, in violation of Fed.R.Civ.P. 26. Defendants/Third-Party

Plaintiffs contend that Spiridonakos had no knowledge of Spiliotes's relationship with

Thenamaris or with Minerva, yet Plaintiff intends to use Spiridonakos's deposition testimony as

expert testimony that covers: his work history and qualifications; the general role and duties of

port captains; the general role of vessel and charterer's agent; the role of an owner's

representative; the employment status of such representatives; special payment arrangements; the

reporting requirements of an agent or representative; and the role of a representative with respect

to cargo discharge. (Supplemental SUMF at ¶¶ 157-163).

Plaintiff argues that Spiridonakos's deposition testimony is being used to rebut Spiliotes's

argument that he was forced to create WWM by Thenamaris, and that WWM was basically a

shell corporation for Thenamaris and Minerva. According to Plaintiff, Spiridonakos trained

Spiliotes as a surveyor and employed him, and has knowledge of the formation of WWM.

Spiridonakos has testified that he had various conversations with Spiliotes concerning the

-13-

**NOT FOR PUBLICATION**

formation of WWM, and what type of work Spiliotes was performing, but at no point did

Spiliotes ever tell Spiridonakos that he was a port captain for Thenamaris or that Spiliotes

formed a shell company for Thenamaris. (Supplemental SUMF at ¶¶ 166-67).

Having reviewed the testimony of Spiridonakos, the Court concludes that while the

majority of his testimony objected to by Defendants/Third-Party Plaintiffs conforms with the

requirements of lay opinion testimony under Fed.R.Evid. 701, some of his testimony more

appropriately qualifies as expert testimony under Fed.R.Evid. 702. For example, in paragraph

163 of the Plaintiff's Supplemental Local Rule 56.1 Statement, Spiridonakos was asked a

hypothetical question during his deposition, concerning what obligations an owner's

representative has to the managers or owners of a ship if a vessel's chief officer is removed from

a ship. (Spiridonakos Dep. at 192:6-9). Spiridonakos responded that the owner's representative

has an obligation to inform the owner immediately. (Spiridonakos Dep. at 192:10-14).

Spiridonakos also responded to a question about whether an owner's representative had any right

to interfere in a vessel's discharge. (Spiridonakos Dep. at 192:15 - 193:19).

These questions and answers concerned hypothetical facts, not facts gleaned from

Spiridonakos's personal perception. But a lay witness may not answer hypothetical questions.

See Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 404 (3d Cir. 1980) (essential

difference between lay testimony and expert testimony is that expert may answer hypothetical

questions); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence §

701.03[4][a], at 701-21 to 701-22 (2d ed. 2004) ("Lay witnesses are limited to testifying to

opinions gleaned from factual information that they personally perceived."). As

**NOT FOR PUBLICATION**

Defendants/Third-Party Plaintiffs have noted, Spiridonakos has not been admitted to testify as an expert in this case. For this reason, the Court will disregard Spiridonakos's statements referenced in paragraph 163 of the Plaintiff's Supplemental Local Rule 56.1 Statement, as well as any other statements that qualify as expert testimony under Fed.R.Evid. 702, but will permit statements that conform to the requirements of lay witness testimony under Fed.R.Evid. 701. Defendants/Third-Party Plaintiffs motion to strike the testimony of Spiridonakos is granted in part, and denied in part.

## C. Plaintiff's Motion to Strike Defendants/Third-Party Plaintiffs' Declaration of James Baker; Defendants/Third-Party Plaintiffs' Motion to Strike the Fernandez Affidavit Concerning James Baker

Defendants/Third-Party Plaintiffs have submitted the Baker Declaration in opposition to the Plaintiff's motion for summary judgment. James Baker was a claims adjuster for UK P&I Club from 1980 to 1994, and claims to have knowledge of Spiliotes's relationship with Thenamaris, the shipping company owned by the Martinos family before the formation of Minerva. The Baker Declaration supports the Defendants/Third-Party Plaintiffs' claim that Spiliotes was an employee of Minerva - an issue that is in dispute.

Plaintiff moves to strike Defendants/Third-Party Plaintiffs' Baker Declaration on the grounds that it fails to comply with Fed.R.Civ.P. 56(c)'s requirements for affidavits submitted in opposition to a motion for summary judgment. Fed.R.Civ.P. 56(e) provides that when affidavits are used to support or oppose a summary-judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P.

-15-

**NOT FOR PUBLICATION**

56(e). "These rules are mandatory." 10B Wright & Miller, Federal Practice & Procedure § 2738 at 328 (2005).

In support of its motion to strike the Baker Declaration, Plaintiff has submitted an affidavit of their attorney, Michael Fernandez (the "Fernandez Affidavit"). Paragraphs 5 through 7 of the Fernandez Affidavit recount Fernandez's version of a telephone conversation he allegedly had with Baker on June 14, 2004, and paragraphs 10 through 12 of the declaration recount a telephone conversation he allegedly had with Baker on July 19, 2005. Plaintiff wishes to use the statements made by Baker during these telephone conversations to support its argument that the Baker Declaration is not based on personal knowledge.

Defendants/Third-Party Plaintiffs contest the Fernandez Affidavit and have moved to strike it from the record on the grounds that the statements constitute hearsay, in violation of the requirement of Rule 56(e) that supporting affidavits "set forth facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). The Court finds, however, that the statements are admissible as statements against interest. Fed.R.Evid. 804(b)(3).

Returning to the Baker Declaration, Plaintiff argues that it should be stricken because Baker lacks personal knowledge of Spiliotes's relationship with Thenamaris. In paragraph 4 of the Baker Declaration, Baker avers,

> I was aware that [Spiliotes] was primarily working for Thenamaris, a Greek
> shipowner, with whom I understood he had a special working relationship. Based
> on my conversations with Spiliotes during those years, I believed that James
> Spiliotes was Thenamaris' local port captain for their tankers calling on the North
> East Coast of the United States.

(Baker Declaration at ¶ 4). The first sentence violates the personal knowledge requirement of

-16-

NOT FOR PUBLICATION

Fed.R.Civ.P. 56(e), as Baker merely states that he was "aware" that Spiliotes worked for

Thenamaris.  See Steelman v. Carper, 124 F.Supp.2d 219, 228 n.25 (D.Del. 2000) (court could

not accept affiant's statement that was based on his "personal awareness" rather than upon

personal knowledge).  Baker fails to provide any basis for his knowledge that Spiliotes worked

for Thenamaris or that they had a special working relationship, other than what he had heard

directly from Spiliotes.  See Visser v. Packer En'g Assoc., 924 F.2d 655, 659 (7th Cir. 1991)

(inferences and opinions must be grounded in observation or other first-hand personal

experience).

        The second sentence also fails to satisfy the personal knowledge requirement of

Fed.R.Civ.P. 56(e), as Baker's use of the word "believed" underscores his lack of personal

knowledge concerning Spiliotes's relationship with Thenamaris. See Hlinka v. Bethlehem Steel

Corp., 863 F.2d 279, 282 (3d Cir. 1988) (use of the word "believe" insufficient to aver personal

knowledge); 10B Wright & Miller, Federal Practice & Procedure § 2738 at 350 (2005).  Because

these statements fail the personal knowledge requirements of Fed.R.Civ.P. 56(e), they must be

stricken from the record.  The remaining three paragraphs of the Declaration are irrelevant.

Plaintiff's motion to strike the Baker Declaration is granted.

### D.      Plaintiff's Motion to Strike Portions of Defendants/Third-Party Plaintiffs' Declaration of James Spiliotes

        The Spiliotes Declaration contains 73 paragraphs, some of which are quite lengthy.

Plaintiff has moved to dismiss 42 of the 73 paragraphs contained in the Spiliotes Declaration,

**NOT FOR PUBLICATION**

and has offered three potential reasons as to why each paragraph should be dismissed.[4]  First,

Plaintiff claims the paragraphs violate the requirements of Fed.R.Civ.P. 56(e), that affidavits

must be based on personal knowledge, shall set forth such facts as would be admissible in

evidence, and shall affirmatively show that the affiant is competent to testify.  Second, Plaintiff

argues that the statements constitute self-serving conclusions "unsupported by specific facts in

the record."  Heffron, 270 F.Supp.2d at 574-75 ("in order to defeat a properly supported motion

for summary judgment, a plaintiff cannot simply rely on "vague", "self serving" statements

which are unsupported by specific facts in the record.") (citations omitted).  Third, Plaintiff

argues that the statements are barred by the "sham affidavit" doctrine, in that Spiliotes's

Declaration statements contradict his earlier deposition testimony. See Baer v. Chase, 392 F.3d

609, 625-26 (3d Cir. 2004) (trial court will disregard an affidavit submitted in opposition to a

motion for summary judgment when the affidavit contradicts the affiant's earlier testimony,

unless there is a good faith basis for the contradiction).

A careful review of the Spiliotes Declaration shows that it is also replete with

inappropriate factual assertions and legal conclusions, in violation of Local Civil Rule 7.2(a).

That rule provides in pertinent part: "Affidavits shall be restricted to statements of facts within

the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in

affidavits." L.Civ.R. 7.2(a). "Such argumentative and speculative statements are limited to

---

[4]Defendants/Third-Party Plaintiffs have mistakenly repeated numbers 32 through 37 in the Spiliotes Declaration. While the last numbered paragraph is 68, there are in fact 73 paragraphs. Defendants/Third-Party Plaintiffs have submitted an Amended Spiliotes Declaration to correct this error.

NOT FOR PUBLICATION

briefs, and should not be included in sworn submissions to this Court." Resolution Trust Co. v. Fidelity & Deposit Co., 1998 U.S. Dist. LEXIS 3431, at *4 (D.N.J. Jan. 27, 1998). This Court will not consider any argumentative or speculative portions of Captain Spiliotes's Declaration, nor will it consider any portions that violate the requirements of Fed.R.Civ.P. 56(e).

Because the Spiliotes Declaration contains 73 paragraphs that cover a broad range of subjects, the Court will neither attempt to summarize the declaration, nor engage at this point in a lengthy analysis to determine which paragraphs should and which should not be stricken from the declaration. To give some context to Spiliotes's Declaration statements, the Court will consider the motion to strike Spiliotes's statements, as the need arises, during the summary judgment analysis.

**II.    Plaintiff's Motion for Partial Summary Judgment**

  **A.    First Counterclaim: Violation of CEPA**

   Defendants/Third-Party Plaintiffs have alleged in their first counterclaim that Minerva violated CEPA, N.J.S.A. 34:19-1, et seq., by firing Spiliotes in retaliation for: disclosing the Chief Mate's threatening statements and behavior; cooperating with law enforcement authorities in their investigation into the Chief Mate's threatening statements and behavior; and complying with the official legal notices sent to Spiliotes by the Bayonne City Municipal Court. (Second Amended Answer with Counterclaim and Third-Party Claims ("Answer with Counterclaims") at ¶ 90). Plaintiff now moves for summary judgment on the first counterclaim.

    **1.    Legal Standard**

   CEPA was "enacted in 1986 to encourage employees to notify authorities of any and all

NOT FOR PUBLICATION

illegal or unethical work-place activities conducted by an employer." DaBronzo v. Roche

Vitamins, Inc., 232 F.Supp.2d 306, 310 (D.N.J. 2002). N.J.S.A. 34:19-3 provides:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;
>
> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper

**NOT FOR PUBLICATION**

quality of patient care;

(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3. "CEPA protects an employee who believing that the public interest overrides the interest of the organization he serves, publicly blows the whistle if the organization is involved in a corrupt, illegal, fraudulent, or harmful activity." DaBronzo, 232 F.Supp.2d at 310-11 (citations omitted) (internal quotations omitted).

The issue here is whether Spiliotes is a protected employee within the definition of CEPA. Plaintiff contends, and has offered substantial evidence to prove, that Spiliotes was not employee of Minerva, but rather was an independent contractor serving as a vessel's agent and marine surveyor employed by his own company, WWM. Plaintiff argues that because independent contractors are not covered by CEPA, summary judgment must be granted against Defendants/Third-Party Plaintiffs on the first counterclaim. Defendants/Third-Party Plaintiffs acknowledge that independent contractors are not covered by CEPA, but argue that an application of the facts of this case to the case law on this subject shows that there are genuine issues of material facts concerning Minerva's and Spiliotes's working relationship that precludes summary judgment.

DaBronzo employed a twelve part test to determine if the plaintiff was an employee or an independent contractor of the defendant. There, both the plaintiff and the defendant agreed that

-21-

NOT FOR PUBLICATION

Pukowsky v. Carusko, 312 N.J. Super. 171 (App. Div. 1998) provided the appropriate test for

determining whether the plaintiff was an independent contractor. The Court noted that while

there are several tests in the employment law context that address whether an individual is an

employee or an independent contractor, "the Pukowsky factors largely encompass the factors

enunciated in most settings."[5]  DaBronzo, 232 F.Supp.2d at 316 n. 11. Under Pukowsky, the

twelve factors for consideration are:

> (1) the employer's right to control the means and manner of employee's
> performance; (2) the kind of occupation, supervised or unsupervised; (3) skill; (4)
> who furnishes equipment and workplace; (5) the length of time individual has
> worked for the company employer; (6) the method of payment; (7) manner of
> termination of the work relationship; (8) does the individual accrue annual leave;
> (9) is the work the individual performs an integral part of the "employer's"
> business; (10) does the individual accrue retirement benefits; (11) does the
> "employer" pay social security taxes; and (12) the intention of the parties.

Pukowsky, 312 N.J. Super. at 182-83 (citing Franz v. Raymond Eisenhardt & Sons, Inc., 732

F.Supp. 521, 528 (D.N.J. 1990)). These factors are based on common law agency principles. Id.

at 182.

Defendants/Third-Party Plaintiffs challenge the use of the Pukowsky factors to determine

whether Spiliotes was an employee of Minerva. Rather, they argue that MacDougall v. Weichert,

144 N.J. 380 (1996), a New Jersey Supreme Court decision, contains the appropriate test. In

MacDougall, the plaintiff was engaged as a salesperson for the defendant real estate firm,

---

[5]The Pukowsky test was established by federal courts interpreting analogous federal
statutes that do not adequately define the term "employee." Kounelis v. Sherrer, 396 F.Supp.2d
525, 532 (D.N.J. 2005) (citing Chrisanthis v. County of Atlantic, 361 N.J.Super. 448 (App. Div.
2003). The test was formulated in the Third Circuit in E.E.O.C. v. Zippo Mfg. Co., 713 F.2d 32,
37 (3d Cir. 1983), where the Circuit defined the term "employee" in the context of the Federal
Age Employment Discrimination Act.

**NOT FOR PUBLICATION**

Weichert. The plaintiff acknowledged that he was neither an employee nor a partner, but was a "Sales Associate with an independent contractor status, with no rights of [worker's] compensation, salary, pension, sick leave, sick pay, or other attributes of an employee relationship." 144 N.J. at 389. Plaintiff was also an elected member of the local municipal governing council. As a member of the council, plaintiff voted for a parking ordinance that was opposed by a client of Weichert. Plaintiff was then terminated by Weichert, and plaintiff sued Weichert under the tort of wrongful discharge.

At issue was whether MacDougall was an employee of Weichert for purposes of raising a wrongful discharge claim under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 (1980). On summary judgment, the trial court found that MacDougall was an independent contractor, meaning he was not protected under the wrongful discharge doctrine. On appeal, the Appellate Division affirmed the trial court's grant of summary judgment. 144 N.J. at 388.

The Supreme Court of New Jersey reversed and remanded the case, finding that there were material issues of subsidiary facts concerning the relationship between the parties that were unresolved by the record.[6] 144 N.J. at 389. Specifically, the Court found several facts suggesting that Weichert exerted substantial control over MacDougall, including the fact that MacDougall worked in an office maintained by Weichert; a Weichert manager supervised MacDougall's work; Weichert required MacDougall to take its training program; and that Weichert shared the commission profits. 144 N.J. at 389. The Supreme Court noted that "the

---

[6]The Supreme Court expressed concern that MacDougall did not present the issue of his employment status on appeal until he filed his reply brief, raising the possibility that the question of employment was not fully presented. 144 N.J. at 390.

**NOT FOR PUBLICATION**

categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined." 144 N.J. at 388-89. It added, "[t]he critical issue is whether the elements of control and dependence coupled with the absence of any employment protection predominate over factors that favor an independent contractor status." 144 N.J. at 389.

Defendants/Third-Party Plaintiffs argue that MacDougall applies because "DaBronzo presents an overly formalistic traditional analysis and does not take account of the modern day realities of the employer-employee relationship." (Defendants/Third Party Plaintiffs' Opp. at 11). Specifically, Defendants/Third-Party Plaintiffs take issue with the factors that assess duration, payment method, annual leave, retirement benefits, social security tax, and workplace.[7] Instead, Defendants/Third-Party Plaintiffs want the focus on the elements of control and dependence.

The basis for their argument is a New Jersey Superior Court case, cited by MacDougall, which states that "innovative variations on traditional employment relationships should not necessarily affect the consequences of the functional relationship between the parties." Crowe v. M&M/Mars, 242 N.J. Super. 592, 598 (App. Div.), cert. denied 122 N.J. 387 (1990). However, MacDougall merely cited Crowe for the proposition that "[w]hether or not a person is dubbed an

---

[7]Defendants/Third-Party Plaintiffs also suggest that public policy favors a finding that Spiliotes is an employee with a CEPA remedy. (Defendants/Third-Party Plaintiffs' Opposition to Plaintiff's Motion for Summary Judgment at p. 10). Defendants/Third-Party Plaintiffs have cited no cases, however, where a Court determined that a worker was an employee under CEPA for public policy reasons.

**NOT FOR PUBLICATION**

employee can have many [legal] consequences.... The answer to the employment question

properly varies with the varying consequences of the determination, and the public policies

engaged." Crowe, 242 N.J. Super at 388.

The Court finds that MacDougall is not at odds with the Pukowsky factors, as applied by

DaBronzo. MacDougall and Pukowsky both place a premium on assessing the employer's

control, and both call for analysis of factors favoring independent contractor status. Moreover,

the Pukowsky factors test incorporates most of the factors contained in other tests used for

determining whether a worker is an employee or an independent contractor. DaBronzo, 232

F.Supp.2d at 316 n.11. In spite of their argument to the contrary, Defendants/Third-Party

Plaintiffs have not cited any case law suggesting that the factors of duration, payment method,

annual leave, retirement benefits, social security tax, and workplace should not be taken into

consideration. Nor does this Court find a compelling reason why those factors should not be

considered. Indeed, the Pukowsky "test represents a 'hybrid' approach combining the traditional

common law focus on the defendant's right to control the alleged employee's efforts with the

more contemporary emphasis on the economic realities of the relationship between the parties."

Kurdlya v. Pinkerton Sec., 197 F.R.D. 128, 133 (D.N.J. 2000).

Nor does this Court accept Defendants/Third-Party Plaintiffs attempt to distinguish

DaBronzo. Although there are some factual discrepancies, they are immaterial to the point at

issue. DaBronzo provides a useful framework under CEPA for determining when a worker is an

employee, and when he is an independent contractor. MacDougall, on the other hand, addressed

the issue of whether a real estate agent was an employee for purposes of a wrongful discharge

**NOT FOR PUBLICATION**

claim. The issue here is whether Spiliotes was an employee under a CEPA claim, not under a wrongful discharge claim. For all these reasons, the Court finds that DaBronzo provides the appropriate framework for determining whether Spiliotes was an independent contractor of Minerva.

Having determined that DaBronzo provides the appropriate analysis, the next step is to apply the Pukowsky factors to determine if Spiliotes was an employee or independent contractor of Minerva. "Whether an individual is an employee or an independent contractor is a question of law to be determined by the court in the absence of a disputed issue of material fact." DaBronzo, 232 F.Supp.2d at 315-16 (citations omitted). Absolute and clear-cut unanimity of all twelve factors is not required in order to determine non-employee status. See Chrisanthis v. County of Atlantic, 361 N.J. Super. 448, 465 (App. Div. 2003). Moreover, the presence or absence of some factors without a reasoned balance will not preclude the granting of summary judgment. Id. (citing Carney v. Dexter Shoe Co., 701 F.Supp. 1093, 1098-99 (D.N.J. 1988).

> ### 2.    Analysis under Pukowsky factors
>
> > #### a.    Factor 1 - Employer's right to control the means and manner of employee's performance
> >
> > > ##### i.    Legal Standard

The first factor requires this Court to assess Minerva's right to control the means and manner of Spiliotes's performance. "The employer's right to control the 'means and manner' of the employee's performance is generally agreed to be one of the most probative factors." DaBronzo, 232 F.Supp.2d at 316 (citations omitted). "The first factor is entitled to this added weight because, under the common law of agency, an employer-employee relationship exists if

-26-

**NOT FOR PUBLICATION**

the purported employer controls or has the right to control both the result to be accomplished and the manner and means by which the purported employee brings about that result." Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000) (citations omitted) (internal quotations omitted). In describing the distinction between a servant (employee) and an independent contractor, the Second Restatement of Agency states the following:

> The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants.

Restatement (Second) of Agency § 220(1) cmt. e (1958).

<em>ii.     Plaintiff's Argument and Supporting Evidence</em>

According to the Plaintiff, the evidence indicates that Spiliotes, not Minerva, possessed the right to control the means and manner of his performance. Plaintiff first notes that Spiliotes had no written employment contract that gave Minerva the right to control his performance, unlike other Minerva employees who had written contracts. (Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("PSUMF ") at ¶ 105, 116). Additional probative evidence of Spiliotes's independent contractor status is that he was the principal of his own company WWM, that had its own office and employees, and provided surveying and other marine services as "Ships Agents & Brokers" and "Marine Technical & Environmental Consultants/Surveyors. (PSUMF at ¶¶ 4, 6-31). Moreover, WWM's holding itself out as an expert in the industry is evidenced by its advertising literature and reports offering WWM's "expert and professional opinion." (PSUMF at ¶¶ 24-29; Supplemental SUMF at ¶ 189).

-27-

NOT FOR PUBLICATION

Plaintiff claims that Minerva's lack of control over Spiliotes is also evidenced by Spiliotes's testimony that he was an expert; he knew his job; no one ever told him how to perform his job; he did not have any guidelines, instruction manuals or operation manuals to follows; and that he could come and go from the vessels whenever he desired. (PSUMF at ¶¶ 70-74, 115). Moreover, Spiliotes admitted that he had "managerial responsibility" over the allocation of work at WWM, and without any consultation with Minerva or any other shipowner, would hire on behalf of WWM: employees, outside contractors, and consultants. (PSUMF at ¶¶ 11-13, 22-23). Spiliotes only received limited instructions from Minerva to cooperate for a "smooth transfer," and Spiliotes testified that such language provided him with the authority to observe "everybody" on board the vessel and to intervene or stop any action he saw that was wrong. (Supplemental SUMF at ¶¶ 206-207).

Finally, Plaintiff rejects the argument by Spiliotes that because WWM acted "in accordance with [Minerva's] instructions," Spiliotes was controlled. (Spiliotes Declaration at ¶ 21). According to Plaintiff, Defendants/Third-Party Plaintiffs fail to mention that such language is identical to language that WWM routinely provides to other customers. (Supplemental SUMF at ¶ 186).

Viewed in its entirety, Plaintiff's evidence is sufficient for the Plaintiff to carry its burden to show that Minerva lacked control over Spiliotes. The evidence suggests that Spiliotes had the authority to control how his jobs were completed on Minerva's behalf, and does not indicate that Minerva controlled the "means and manner" of how he performed his tasks. The burden now shifts to Defendants/Third-Party Plaintiffs to show that there is a genuine issue of material fact

-28-

**NOT FOR PUBLICATION**

concerning Minerva's lack of control over Spiliotes.

*iii.     Defendants/Third-Party Plaintiffs' Rebuttal*

Defendants/Third-Party Plaintiffs dispute several paragraphs from the Plaintiff's Local

Rule 56.1 Statement, offered to show that Minerva lacked control over Spiliotes.  First,

Defendants/Third-Party Plaintiffs dispute paragraph 105, which states that Spiliotes effectively

admitted that he had no written contract with Minerva, and instead relied upon an "oral contract"

formed with a dead man named Captain Selementas, an employee of Thenamaris.  In response to

paragraph 105 of the Plaintiff's Local Rule 56.1 Statement, Defendants/Third-Party Plaintiffs cite

paragraphs 7 through 15 of the Spiliotes Declaration, which describe why Spiliotes created

WWM, how he moved from Thenamaris to Minerva, what his responsibilities were, and what his

title was.  However, it is unclear to this Court how paragraphs 7 through 15 of the Spiliotes

Declaration dispute the Plaintiff's statement that Spiliotes had no written employment contract

with Minerva.  Indeed, there is no mention of any contract in paragraphs 7 through 15

whatsoever.  Defendants/Third-Party Plaintiffs have failed to raise a genuine issue with respect to

the fact that Spiliotes did not have an employment contract with Minerva.[8]  The Court will also

disregard Defendants/Third-Party Plaintiffs disputes of paragraphs 10, 18, 19, 20, 24, 27 and 74

of the Plaintiff's Local Rule 56.1 Statement, as those disputes are immaterial.

Defendants/Third-Party Plaintiffs dispute Plaintiff's general claims that Minerva lacked

---

[8]Plaintiff has also moved to strike paragraphs 7, 9, 10, 12, 13 and 15 of the Spiliotes
Declaration.  The Court will refrain from considering the motion to strike at this point, given that
the paragraphs fail to create a genuine issue with respect to the fact that Spiliotes did not have a
written employment contract with Minerva.

-29-

**NOT FOR PUBLICATION**

control over Spiliotes. On the contrary, they argue that Minerva exerted substantial control over Spiliotes, and that Spiliotes was completely dependent upon them. Defendants/Third-Party Plaintiffs claim that Spiliotes had standard assignments from Minerva that he was required to perform on every Minerva ship, and that Minerva's operations managers gave Spiliotes specific instructions to perform these tasks. Spiliotes reported back to Minerva that he performed his assigned duties "in accordance with [Minerva's] instructions." (Spiliotes Declaration at ¶¶16-22). They also claim that Spiliotes received instructions from Minerva's operations department for additional assignments that periodically arose, and have provided examples of such situations. (Spiliotes Declaration at ¶¶ 19-33).

Defendants/Third-Party Plaintiffs have provided evidence to show the extent to which Spiliotes relied on Minerva for his livelihood. As a result of this reliance, they contend that Minerva exerted a great deal of control over their relationship as well as over Spiliotes in performance of his job. This manifested itself in that: Minerva required Spiliotes to have his own company while working for Minerva; Minerva controlled how, when, and what they paid Spiliotes; and Minerva sometimes required that Spilotes guarantee their local financial obligations. (Spiliotes Declaration at ¶¶ 34-48).

Defendants/Third-Party Plaintiffs reiterate that merely because Spiliotes worked for Minerva through his company WWM, that alone is not evidence that he was an independent contractor. MacDougall, 144 N.J. at 388-89. Defendants/Third-Party Plaintiffs also argue that the various job descriptions Spiliotes used - ship's agent, owner's agent, owner's protective agent, surveyor, port captain, etc. - are in effect meaningless. (Spiliotes Declaration at ¶¶ 22-23).

NOT FOR PUBLICATION

In addition, they cite the testimony of Captain Vezyrtzis, a Minerva employee, and of James Baker, a claims adjuster with UK P&I Club, as additional evidence that Spiliotes had a special relationship with Minerva.[9] (Spiliotes Declaration at Exh. M; Baker Declaration at ¶¶ 1-4). Finally, Defendants/Third-Party Plaintiffs argue that Minerva required Spiliotes to have his own company while working for its own benefit, in order to avoid United States regulations, to have the appearance of independence and objectivity when they used Spiliotes's reports in defending claims of third-parties, and to allow Minerva to submit part of the cost for Spiliotes's work to insurers for reimbursement. (Spiliotes Declaration at ¶ 12).

As discussed in section I.B, supra, Plaintiffs have moved to strike several paragraphs from the Spiliotes Declaration, which underlie Defendants/Third-Party Plaintiffs contention that Spiliotes was controlled by Minerva. These motions to strike must be addressed before this Court can determine whether there is a genuine issue of material fact concerning Minerva's lack of control over Spiliotes.

iv.    *Plaintiff's Motion to Strike Spiliotes's Declaration*[10]

Plaintiff moves to strike several statements from the Spiliotes Declaration that Defendants/Third-Party Plaintiffs have cited to support their argument that Spiliotes was controlled by Minerva. The first group of statements are paragraphs 16 through 19 and 22, which Defendants/Third-Party Plaintiffs have cited to show that Spiliotes received specific instructions

---

[9]As discussed earlier, however, the Baker Declaration is stricken and will not be considered on this motion for summary judgment. (See Section I.C, supra).

[10]The cited paragraphs refer to the Amended Spiliotes Declaration, not the original Spiliotes Declaration. (See fn. 4, supra).

NOT FOR PUBLICATION

from Minerva. Those paragraphs read as follows:

¶ 16 - Contrary to Minerva's assertion that I was a 'free agent' on their ships with discretion to do whatever I wanted, I had specific instructions and assignments from Minerva's operations department.

¶ 17 - There were standard assignments that I had to accomplish for every Minerva ship I worked onboard. These assignments came from Minerva's operations department. They included assisting the captain, officers and crew with safe and efficient cargo operations; interacting with the terminal, cargo receivers, charterers and charterer's agents as necessary; ascertaining the quantity of cargo onboard prior to and at the completion of discharge; observing cargo discharge rates and rail pressures during the discharge; preventing the loss of the liquid cargo; recording all relevant times; protesting all discrepancies; and issuing proper certificates at completion of discharge of cargo.

¶ 18 - Pursuant to my specific instructions from Minerva's operations department, my typical work onboard Minerva vessels either in port or at a lighterage anchorage consisted of the following: I met the ship on arrival and I immediately met with the master and chief mate. I assisted the master and chief mate with preliminary arrival issues, such as clearing the ship with U.S. Customs and other port officials. After those issues were resolved, my primary duties concerning the discharge of the cargo began. I inspected and gauged the cargo tanks along with the vessel's chief mate and the terminal's and/or cargo receiver's surveyors ("cargo interests"). Along with the chief mate, I performed all necessary calculations to ascertain the quantity of cargo onboard to ensure the amount corresponded to the amount loaded at the load port. Once those figures were determined and agreed upon with cargo interests, I made a general inspection of the main deck prior to commencement of discharge. In particular, I inspected the mooring lines to determine they were secure; I ensured that all scuppers were plugged to prevent an accidental spill; and, most importantly, I ensured that the cargo hose connection from the ship's manifold to the terminal was satisfactory. Also prior to the commencement of discharge, I checked with cargo interests to obtain their instructions concerning shore line displacement procedures. I then waited along with the chief mate for the terminal to instruct us to commence discharge and, when they did, I monitored the initial discharge to ensure it was proceeding safely and efficiently. During the initial discharge, I would monitor the cargo discharge pressure in the cargo control room as well as at the ship's manifold on deck. I also made another round on the main deck during the initial discharge to ensure everything was still in good order i.e. the mooring lines, cargo hose connection, scupper plugs, etc. Throughout the discharge, which could take anywhere from twenty-four hours or more, I was generally about on deck and in

-32-

NOT FOR PUBLICATION

the cargo control room to ensure all aspects of the discharge went efficiently and safely. In this regard, I observed and recorded the discharge rates, rail pressures, relevant times, etc. and I attended to any cargo related issues that arose along with the chief mate and other deck officers. Those issues generally entailed switching shore cargo tanks, suspending the discharge (for the ship's and/or terminal's purposes), issuing protests, etc. As the completion of discharge neared, I assisted the chief mate with stripping the shp's tanks of cargo. Once that was accomplished, I inspected the cargo tanks with the cargo interests. We gauged each tank to determine whether any cargo was remaining onboard. I then assisted the master in making preparations to sail, including preparing proper certificates. I did not depart until the vessel's last mooring line was aboard the ship and the vessel actually sailed.

¶ 19 - In no sense was I simply a vessel husbandry agent as Minerva would have this Court believe. What I did with my job for Minerva and what a husbandry agent does are simply not the same thing. As set forth above, I was **actually** an integral member of Minerva's operations department working aboard Minerva vessels while they were discharging cargo in New Jersey and other ports in the North East. Everything I did onboard Minerva vessels was done pursuant to my specific instructions from Minerva's operations department. I was their eyes, ears, legs and arms in the North East and at terminals in New Jersey in particular.

¶ 22 - In the beginning of my working for Minerva, I had numerous telephone calls with Captain Vezyrtzis concerning my standard assignments and instructions and what they expected of me when I worked as their representative onboard their vessels. As I testified at my deposition:

Q.     But in the first instance Minerva told you what to do?
A.     The first thing Minerva instruct me, told me what to do, and then after that they knew what I was doing and they didn't instruct me more. But the first couple of years I would say they would send from the telephone instructions what to do there on that ship.
                    *          *          *
Q.     Right. Right. But when you're doing, you know, our job on board the ship, say like going aboard the Minerva Julie to do the protection job on the discharge -
A.     Protection job, what's that?
Q.     You know, to supervise the discharge of the ship.
A.     Yes.
Q.     All right. Minerva doesn't tell you how to do that, do they?
A.     Well, Minerva knows that I know how to do that.
Q.     Right.

-33-

NOT FOR PUBLICATION

> A. However, they tell me be careful, they tell me what to be careful. They tell me look, watch the pressure don't go higher than this or make sure that all the lines on the ship that stop it to so much pressure, to withstand so much pressure. The give me instructions. I didn't do it myself, no.
>
> Q. Where did they give you these instructions, did they write them to you?
>
> A. Most of it by phone.
>
> Q. Most of it by phone. So you have nothing in writing about instructions like that?
>
> A. I may have some. I don't know. I don't know. I may have some.
>
> Q. All right. But your brochure says that you're an expert, that you know how to do all these things?
>
> A. Yes, I know how to do all these things.
>
> Q. So you don't need anybody to tell you how to do that?
>
> A. But that's their ships and they tell me how to do it. That's their ships. They are careful what I was doing on the ship. I was their port captain but they would instruct me on how to do it, how to do things.

(Spiliotes Declaration at Exhibit A, 712, 722-24).

Plaintiff makes several arguments as to why paragraphs 16 through 19 and 22 should be stricken. First, Plaintiff argues that the statements contained in these paragraphs are merely self-serving statements by Spiliotes not based on any evidence in the record. " See Heffron, 270 F.Supp.2d at 574-75 ("in order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on "vague", "self serving" statements which are unsupported by specific facts in the record.") (citations omitted). Specifically, Plaintiff argues that there is no evidence in the record to support Spiliotes's Declaration that he received specific instructions from Minerva's operations department.

Defendants/Third-Party Plaintiffs contest the motion to strike by arguing that Spiliotes did in fact testify that he received instructions from Minerva. (Spiliotes Deposition at pp. 711-712, 722-725). However, the cited deposition testimony is insufficient to support Spiliotes's statements contained in paragraphs 16 through 19, as the deposition testimony merely states that

-34-

**NOT FOR PUBLICATION**

he received instructions from Minerva, but does not specify from whom within Minerva he received instructions. Paragraphs 16 through 19, on the other hand, specify that he received instructions from Minerva's Operations Department.

The deposition testimony also lacks the specificity of the instructions described in paragraphs 17 and 18 of Spiliotes's declaration. For example, Spiliotes testified in his deposition that "they tell me what to be careful. They tell me look, watch the pressure don't go higher than this or make sure that all the lines on the ship that stop it to so much pressure, to withstand so much pressure. They give me instructions." (Spiliotes Deposition at 722). He also testified that he was instructed on how to repair the radar. (Spiliotes Deposition at 722). By contrast, paragraph 18 of the declaration states that Spiliotes met the ship on arrival, and he immediately met the Master and Chief Mate; he assisted the Master and Chief mate with preliminary arrival issues, such as clearing the ship with U.S. Customs and other port officials; he inspected and gauged the cargo tanks along with the vessel's Chief Mate and the terminal's and/or cargo receiver's surveyors, etc. (Spiliotes Declaration at ¶ 18). Paragraph 17 of the Declaration contains even more detailed instructions. In short, the cited deposition testimony does not create a sufficient foundation for paragraphs 16 through 19 of the Spiliotes Declaration because the testimony does not identify who gave Spiliotes the instructions, what instructions he was given, when they were supposedly given, and under what circumstances they were given. Because paragraphs 16 through 19 lack the support of any evidence in the record, Plaintiff's motion to strike paragraphs 16 through 19 of the Spiliotes Declaration is granted.

Paragraph 22 of the Spiliotes Declaration states that Spiliotes had numerous calls with

-35-

**NOT FOR PUBLICATION**

Captain Vezyrtzis concerning his assignments and instructions. While the deposition testimony

included in paragraph 22 states that Spiliotes received instructions, it does not specify that he

received instructions from Captain Vezyrtzis. Defendants/Third-Party Plaintiffs have not

challenged the motion to strike paragraph 22 in their opposition to the motion to strike, and they

have failed to cite any other testimony in support of the paragraph. Plaintiff's motion to strike

paragraph 22 is granted.

Plaintiff next challenges the statements that are the basis for Defendants/Third-Party

Plaintiffs' claim that Spiliotes received instructions from Minerva's operations department for

additional assignments that periodically arose. (Spiliotes Declaration at ¶¶ 19-33). Plaintiff

moves to strike paragraphs 19, 22 through 26, and 28 through 30 of the Spiliotes Declaration.[11]

> ¶ 23 - In addition to receiving instructions for my standard assignments, I also
> received instructions from Minerva's operations department for additional
> assignments that periodically arose.

> ¶ 24 - For example, I would often be tasked with certain duties and assignments
> from the operations department when Minerva vessels had to be inspected by the
> United States Coast Guard to obtain what is known as a Tanker Vessel
> Examination Letter or TVEL. ( Spiliotes Declaration at Exh. D).

> ¶ 25 - I was instructed to meet with the vessel's master prior to the Coast Guard's
> inspection, and to review with him the status of various items that the Coast
> Guard was going to check. I was instructed to review with the master the status of
> various documents that had to be copied for the Coast Guard including the
> vessel's Certificate of Financial Responsibility, SOLAS documents, class
> certificates and ISM documents. I was instructed to review with the master the
> status of various logs, manuals and certificates that had to be made available
> including the ship's log, oil record books and SOLAS manuals. I was instructed
> to review with the master the status of publications that were required to be in the
> wheelhouse including the U.S. Coast Pilot, Tide Tables and recent Notices to

---

[11]The Court will not revisit paragraphs 19 and 22, which have already been addressed.

NOT FOR PUBLICATION

Mariners. I was instructed to discuss and ensure with the master that ll pre-arrival
tests and inspections had been performed and logged including the emergency
steering gear tests and standby emergency generator test. I was instructed to
discuss and ensure with the master that other testing was periodically performed
and logged as part of the ship's normal policies and procedures, including
pressure testing of cargo lines, cargo pump tests, fire pump tests and IGS tests. I
was instructed to review with the master various vessels log books to make sure
they were kept properly such as the vessel's log, dangerous cargo manifest and oil
record book. And, I was instructed to review with the master what he should
expect during the actual inspection - what documents the Coast Guard was likely
going to review, what ship's equipment the Coast Guard was likely going to tet
and what ship's equipment the Coast Guard was likely going to visually inspect.

¶ 26 - Minerva also instructed me to be present during the Coast Guard's TVE
inspections so I was available to report to the operations department any issues
that arose and to address them in accordance with their instructions. For instance,
I was aboard the Minerva vessel the AMPHITRITE in New York when it failed its
initial Coast Guard TVE inspection in September, 2000. The vessel failed the
initial inspection, among other reasons, because one of the lifeboat brakes was
frozen and the boat could not be lowered. (Coast Guard's Vessel Boarding
Reports - Exhibit E). I called Minerva to report the situation and to get their
instructions on how to deal with it (including to report the vessel's master who
had misinformed me before the inspection that he had recently successfully
lowered the lifeboat when, in fact, it had not been lowered for six months). As I
testified at my deposition:

Q.   Can you tell us your involvement - well, did Minerva - did the U.S. Coast
      Guard perform any TVEs on Minerva vessels when they called on the East
      Coast of the U.S.?
A.   Yes, they do that on a yearly basis.
Q.   Did you have any involvement in those tanker vessel examinations or
      TVEs?
A.   Yes.
Q.   Can you describe for us the extent of the involvement you had?
A.   I talk to the captain first, day before usually before the TVE, and I ask him
      if the lifeboats are okay to be lowered and if the motors are running, and if
      they don't, I always do it from the boat that time. I ask him also if all
      entries are made. He told me yes, yes. For example, this ship, on the
      AMPHITRITE I'm talking about now, he said yes, we have everything
      under control, we lower the lifeboats a couple days ago, the lifeboats go
      down. I said you make entries in the logbook. Yes, of course, I did. So
      the next day the Coast Guard come aboard to perform a TVE and he

NOT FOR PUBLICATION

started with the fire drill.  The crew was very slow.  And then after the fire drill, he went over to do the boat drill.  He tried to lower one of the lifeboats, I think it was a starboard - port lifeboat or starboard, I don't remember which one, and the lifeboat did not go down.  So I look at the captain, I said look, you told me that a couple of days ago you lowered.  He says you know what, he says, these lifeboats haven't gone down for six months.  So if he was telling me that night before I was going to have another fire [and boat drill] the night before, you know, I think the lifeboats go down.  So when I see that, I call Minerva.  That's what I was there for, that's what my job was for, that's what a port captain does.  I didn't tell the captain anything.  I called Minerva, I told Minerva.  I talked to Captain Dallaris and I said the ship was detained....

(Spiliotes Declaration at Exh. A, 690-92)

¶ 28 - At times, Minerva would call me to instruct me to contact the Coast Guard and get their permission to allow Minerva's vessels to enter port with an expired TVEL.  For instance, in July, 2001, Minerva instructed me to obtain the Coast Guard's permission to allow the Minerva vessel the MINERVA ALEXANDRA to enter port and commence discharge with an expired TVEL.  I did so and obtained the Coast Guard's approval.  (Spiliotes Declaration at Exh. F).

¶ 29 - As another example, I would often receive instructions from Minerva concerning getting fuel, known as bunkers, or fresh water for Minerva ships.  For instance, attached as Exhibit G hereto are fax instructions I received from the operations departments in September, 1998 concerning fuel and fresh water for the Minerva vessel SEAMUSIC III.

¶ 30 - To the extent that problems arose onboard Minerva's ships, I would contact the operations department to report the situation and to seek their instructions.  As I testified at my deposition:

Q.   Give me an example, a specific example of something that they instructed you specifically to do on board the Minerva Julie on September 24th - September 26th, 2001.

A.   Well, we didn't have any problems there except the incident with the chief mate.

Q.   All right.

A.   So if you had any problem - excuse me, Mr. Russo, if we have any problem, I call them up and they tell me look, do this, do that, you know.

Q.   If you have a problem you call them up.

A.   I call him up I says, yes.